## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF:
ELECTRONIC DEVICES DESCRIBED IN
ATTACHMENT A AND CURRENTLY IN
THE CUSTODY OF HSI AND THE
GREENLAND, NH POLICE
DEPARTMENT

Case No. 1:22-mj-183-01-AJ

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Ronald Morin, a Special Agent with the United States Department of Homeland

Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI),

being duly sworn, do depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—

cell phones, computers, computer media, and other electronic devices seized on or about August

3, 2022, and further described below and in Attachment A (hereinafter referred to as the

"SUBJECT DEVICES")—which are currently in law enforcement possession, and the extraction

from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Department of Homeland Security,

Immigration and Customs Enforcement, Homeland Security Investigations (HSI), and have

been so employed since May 2006.  I am currently assigned to the Manchester, New

Hampshire field office.  As part of my regular duties as an agent, I investigate criminal

violations relating to a broad range of immigration and customs related statutes, including

those relating to child exploitation, child pornography, coercion and enticement of minors,

and human trafficking.  I have received training in the area of child pornography and child

exploitation, and as part of my duties have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. §2256) in various forms of media, including digital/computer media.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including stalking, in violation of 18 U.S.C. § 2261A, and I am authorized to request and execute warrants issued under the authority of the United States.

3.      I am a "Federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

4.      The statements in this affidavit are based on my own investigation of this matter as well as on information provided by other law enforcement officers.  Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement officers, and I specifically relied on oral reports and opinions from other law enforcement officers.  When information is based on my personal knowledge or conclusion, it will be so stated. Conversations and discussions below are set forth in substance only unless noted otherwise. Any statements excerpted from recorded conversations, including those quoted herein, are preliminary and subject to further revision.

5.      Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  While I have included all material facts relevant to the requested search warrant, I have not set forth all of my knowledge about this matter.

6.     I submit that the facts set forth in this affidavit establish probable cause to believe that violations of 18 U.S.C. §§ 2251(a) & (e) (sexual exploitation of a minor and attempted sexual exploitation of a minor), 2252A(5)(B) (possession of child pornography), 2422(b) (coercion and enticement of a minor), and 2261A (stalking of a minor) have been committed and that there is probable cause to believe that fruits, evidence, and instrumentalities of the specified federal offenses are likely to be found in the SUBJECT DEVICES.

## IDENTIFICATION OF DEVICES TO BE EXAMINED

7.     The applied-for warrant would authorize the forensic examination of the following SUBJECT DEVICES for the purpose of identifying electronically stored data more particularly described in Attachment B:

a.     One black Apple iPhone, in a black case, serviced by T-Mobile and assigned telephone number ending -1839, currently in the lawful possession of HSI at 275 Chestnut Street, Suite 307, Manchester, New Hampshire, that was seized during the execution of search warrants on August 3, 2022; and

b.     The following devices currently in the lawful possession of the Greenland Police Department, 16 Town Square, Greenland, New Hampshire, that were seized during the execution of search warrants on August 3, 2022:

    i.     Sony Digital "Handycam" Video Camera, 422221;
    ii.    Optimus GPS Tracker 3.0 in Magnet Case, black in color;
    iii.   CoolPix W300 Digital Camera, 20076695;
    iv.    Zetroiny Wireless Camera;
    v.     HP Photosmart Camera M477, CN79CAA0XH;
    vi.    Mini 5918 HD Button DV Camera;
    vii.   Apple iPhone, black in color;
    viii.  Blu Tracfone, black in color;

3

| | |
|---|---|
| ix. | SanDisk BQ2135003663 256 GB; |
| x. | SanDisk BQ2135003663 256 GB; |
| xi. | SanDisk 8 GB, BI171026128Z; |
| xii. | PNY 16 GB Thumb Drive; |
| xiii. | 32 GB Recording Device; |
| xiv. | Micro SD Card - 32 GB WS22; |
| xv. | Optimus GPS Tracker 3.0 in Magnet Case; |
| xvi. | Optimus GPS Tracker 3.0 in Magnet Case; |
| xvii. | HD Infrared Waterproof Button Camera Blk w/cord; |
| xviii. | HP CD-R 700MB HD, with the words "CHICK WEED PUSSY" handwritten on disc; |
| xix. | 32 GB Hidden Camera X002K4X421; |
| xx. | Nexar Dashcam with GPS WC591111490564; |
| xxi. | Nexar M/V Interior Camera 752830391656; |
| xxii. | Wireless Mini DVR 2.4G 5V; |
| xxiii. | Dell Inspiron 15 #17543618318 #8250MJ2 #45173/SDPP1/2016 5100; |
| xxiv. | Toshiba Satellite L875D-S723, 66204956R; |
| xxv. | SanDisk Imagemate Plus 32 GB MicroSD UHS-I. |

## PROBABLE CAUSE

*Investigation Background:*

8.       Beginning in May 2022, the parents of John Doe1, a minor child, contacted the Greenland New Hampshire Police Department regarding Michael Adam Chick ("CHICK"), their children's school bus driver, and his inappropriate attention to John Doe1. Among other things, CHICK regularly gave gifts such as candy, Pokémon paraphernalia, and small toys, to John Doe1 and his sibling.

9.       On May 6, 2022, Greenland Police Officer Michael Drake and School Resource Officer Nicholas Drew spoke with CHICK about his behavior towards John Doe1, and they advised him to have no further contact with John Doe1 and his family. At that time, CHICK provided his telephone number ending in -1839 to officers.

4

*Cellphones Recovered by Parents:*

10.     On July 2, 2022, the parents of John Doe1 reported that two Tracfone cell phones were found in John Doe1's bedroom. When questioned about the phones by his parents, John Doe1 advised that CHICK had given him the phones. John Doe1 explained that, several days after Greenland Police Officers told CHICK to have no further contact with John Doe1 and his family, CHICK called John Doe1 over to his bus and offered the cell phones. Although John Doe1 initially declined CHICK's offer, he eventually accepted the cell phones. John Doe1 provided the passcode "8888" for both phones. John Doe1's parents examined the two Tracfone cell phones. While they did not see if any photographs had been sent or received, John Doe1's parents noted that there were three contacts stored in the phones: AA[1] (telephone number with last four digits -5614), BB (telephone number with last four digits -1205) and CC (telephone number with last four digits -1839). John Doe1's parents provided the two Tracfone cell phones to Officer Drake.

11.     On July 6, 2022, the Portsmouth Child Advocacy Center (CAC) conducted a forensic interview of John Doe1, who disclosed that he obtained cell phones from CHICK and had spoken with CHICK one time on the phone about Pokémon.

12.     On July 7, 2022, Greenland Police Sergeant Wayne Bertogli obtained state search warrants for the two Tracfone cell phones recovered by John Doe1's parents and for phone records for the three cell phone numbers saved as contacts as AC (telephone number with last four digits -5614), BB (telephone number with last four digits -1205) and CC (telephone number with last four digits -1839). Through this investigation, the Greenland Police Department

---

[1] The parents reported this number as "AA," however, Detective Jacques confirmed that the number was listed as "AC" in the stored contacts following the Cellebrite extraction.

confirmed that telephone number ending -1839 was CHICK's primary phone number and service

was provided by T-Mobile. Investigators determined that AC (telephone number with last four

digits -5614) and BB (telephone number with last four digits -1205) were Tracfones with service

provided by Verizon Wireless.

13.    Portsmouth Police Detective Duane Jacques performed Cellebrite extractions of

the two Tracfone cell phones.  According to the forensic data, both Tracfone cell phones had

been connected to Wi-Fi networks identified as "1986state" and "chickhouse"[2].  Based on his

review of the extractions, Detective Jacques noted the following:

    a.    From telephone number with last four digits -5599 (22GRE-56-PR):

        i.    Thumbnail of CHICK's face while lying on the floor,
        ii.    Two (2) incoming SMS messages from CHICK, including a message
            on 06/02/22 stating, "Gotta do it again bro," and
      iii.    From the web history, an article entitled "A 1-year-old boy died after
            being raped by 2 Russian soldiers, Ukraine says from Start Magazine"
            viewed on 05/21/2022.

    b.    From telephone number with last four digits -5614 (22GRE-57-PR):

        i.    Six incoming SMS messages from CHICK, including a message on
            06/08/22 stating, "Clearly, you just aren't going to listen. So I think I
            might tell them to just go ahead and do it."

*School Bus Surveillance:*

14.    Pursuant to a state search warrant, on July 20, 2022, Greenland Police Chief Tara

Laurent and Sgt. Bertogli obtained and reviewed school bus surveillance footage from May 6,

---

[2] On July 26, 2022, HSI Special Agent Eric Tracy conducted surveillance of CHICK's residence at 1989 State Road in Eliot, Maine, where he observed a vehicle registered to CHICK parked in the driveway. SA Tracy checked for available Wi-Fi networks while parked to the left of the driveway and identified the available secure network "1986state". On August 3, 2022, I participated in the execution of search warrants at CHICK's residence. Among other things, I checked for available Wi-Fi networks and identified the Wi-Fi network "chickhouse," which CHICK's mother later confirmed was the name of their secure Wi-Fi network.

2022, through June 15, 2022, for interactions between CHICK and John Doe1. The surveillance

footage provided additional evidence that CHICK provided cellular phones to John Doe1 and

coached John Doe1 on how to use the phones.  Below are transcriptions of relevant

conversations[3] between CHICK and John Doe1 captured by the bus surveillance system, which I

believe is consistent with coercive conduct designed to groom John Doe1 for sexual exploitation.

      a.  <u>May 13, 2022</u>

| | |
|---|---|
| CHICK: | I'm not mad at you. I understand why you didn't lie to your mom. We're still in this situation, right? Have you been worried about it? |
| John Doe1: | Yeah |
| CHICK: | Remember our deal? The reason they haven't gone to that (inaudible) is I've been paying $1,000 a week (inaudible) hold them off while I try to figure out what I gotta do. At some point I want to give you this (inaudible) cell phone. |
| John Doe1: | I don't think I can. |
| CHICK: | You can use it at school. Use it in the bathroom. |
| John Doe1: | I don't think I can take that. |
| CHICK: | I don't know what else … I don't know what to do then. |

      b.  <u>May 20, 2022 (morning)</u>

| | |
|---|---|
| CHICK: | Can't say anything about this. It has to be done today. Take this and put it in your backpack. At some point after 9 o'clock go in the bathroom when you're by yourself and call the number that's been pre-programmed into it. Ok? |
| John Doe1: | Okay. |
| CHICK: | The passcode is – just remember your age – it's 8888 … four 8s. You won't have to bring this home. You can drop it off (inaudible) |
| John Doe1: | Can I do it at my house? |
| CHICK: | You'd rather have the – |
| John Doe1: | I'd rather do it at my house. |
| CHICK: | For today can you just call at the school and then return the phone to me? Sorry.8888. |

      c.  <u>May 20, 2022 (afternoon)</u>

| | |
|---|---|
| John Doe1: | I have the phone for you. |
| CHICK: | Yeah? You gonna bring it home with ya? You said you were more comfortable bringing it home. As long as you leave it somewhere they're not |

---

[3] The transcription provided is preliminary only. The surveillance system had audio and video capabilities, but the audio quality suffered due to a number of factors, including the presence of other children.

gonna see it. Don't let them see it, ok?

     d.  <u>May 24, 2022</u>

| CHICK: | What happened to the thing? I'm sure the battery's dead now. |
| John Doe1: | I couldn't call (inaudible). |
| CHICK: | Nobody found it, right? |
| John Doe1: | Yeah, nobody found it. |
| CHICK: | This one's way easier to use. |
| John Doe1: | What? |
| CHICK: | This one's way easier to use. |
| John Doe1: | Ok. |
| CHICK: | There are three contacts in it. |
| John Doe1: | Ok. |
| CHICK: | The contacts are easy to find. There's an A, a B, and a C, alright? That's the name of the contacts under favorites. If you go to contacts, then favorites … try A first, then if that doesn't go through, then B, then go to C, ok? If anyone does find it, you found it on the ground at school near the lost and found. |
| John Doe1: | Ok. |
| CHICK: | I didn't give it to you. |

     e.  <u>May 27, 2022</u>

| CHICK: | What happened this time? |
| John Doe1: | What? |
| CHICK: | What happened this time? |
| John Doe1: | I'll save it for tomorrow. I forgot it today. |
| CHICK: | I can't keep telling them that you forgot. (Inaudible) You know when you plug it in then you hit a button on the side. |
| John Doe1: | I did, but it wouldn't work. |
| CHICK: | Did blue lights come on? |
| John Doe1: | No. (Inaudible.) |
| CHICK: | Can you take this one? This is how you use it – push this button. Contacts in there, A, B, C … just hit C. I can't keep giving them excuses. |

     f.  <u>May 31, 2022</u>

| CHICK: | Did you bring them? |
| John Doe1: | I don't have them. |
| CHICK: | Well, where are they? |
| John Doe1: | They're at my house. |
| CHICK: | So you understand what's going to happen if you don't do it? |
| John Doe1: | Yeah. |
| CHICK: | They're like this close. |

| | |
|---|---|
| John Doe1: | I'll try doing it today (inaudible). |
| CHICK: | Well, yeah, but okay. Just return this one later. You don't have to bring this one home. |
| John Doe1: | Ok. |
| CHICK: | At school. Take this phone. |
| John Doe1: | I can't. |
| CHICK: | I can't keep telling them that you forget. |
| John Doe1: | I'll try doing it today at my house. |
| CHICK: | They're dead. The phones are dead. |
| John Doe1: | They are? |
| CHICK: | The batteries are dead. Just in the bathroom at school. |
| John Doe1: | I can't. I'll try doing it with the other phone, okay? |
| CHICK: | Okay. The one with the big charger? |
| John Doe1: | Yeah. |
| CHICK: | If you can't get that one to charge, bring it tomorrow. |

g. <u>June 1, 2022</u>

| | |
|---|---|
| CHICK: | Hi there. Did you bring one? |
| John Doe1: | Yeah. |
| CHICK: | If I give you a fully charged one, will you be able to call? (Inaudible) The bus isn't going to leave without you. Can you read this real quick? |
| John Doe1: | What? |
| CHICK: | Can you read this real quick? So I don't have to say it. |

[John Doe1 looked at something in CHICK's lap.]

| | |
|---|---|
| John Doe1: | Okay, fine. Gimme it. |
| CHICK: | I'm not going to sell your pictures. Please remember. |
| John Doe1: | I'll try doing it today. There might be a uhhhh (inaudible). |

h. <u>June 6, 2022 (morning)</u>

| | |
|---|---|
| CHICK: | You didn't bring the dead one? Yesterday, when your mom and dad were in Boston and you were at your grandmother's house, we were right across the street. (Inaudible) and I'm doing everything I can to stop them from doing very bad things. You remember last week when you called? |
| John Doe1: | Yeah. |
| CHICK: | I don't know if you listened to everything I said, but you need to check in. |
| John Doe1: | Check what? |
| CHICK: | You need to check in daily. Thursday you walked by |
| John Doe1: | I'm sorry. |
| CHICK: | I called you over and you just kept on walking. I had to tell them that. |
| John Doe1: | I don't think I heard you. I'll try doing it today. |

| CHICK: | Alright. Can you stop by the bus this afternoon? |
|---|---|

    i.  <u>June 6, 2022 (afternoon)</u>

| CHICK: | So, Last…Last Wednesday was good (inaudible) and got your call, but then the rest of the week, you didn't (inaudible). If I have to tell you something… |
|---|---|
| John Doe1: | Yeah. |
| CHICK: | in the week to do, you didn't do it and that's why they followed you to your grandmother's house. Especially if you're gonna go somewhere, you gotta let me know (inaudible). They were there yesterday, and they were going to cause (inaudible) that needed to be done and you weren't going to do it. I lied to them and said you did it Saturday. |
| John Doe1: | Yeah. |
| CHICK: | (Inaudible) don't have the proof that's on the phone and I can't get the phone right now. So, if I get the phone Monday, I can give it to them Tuesday … but that means what you were supposed to do Saturday and what I told them was done you obviously haven't done, so you have to do it today. |
| John Doe1: | Yeah. |
| CHICK: | Alright? |
| John Doe1: | Yeah. |
| CHICK: | So, even if you (inaudible), put that in your backpack (inaudible) charger again, okay? |

15.     Based on the surveillance footage, the Greenland Police Department requested assistance from HSI due to the threats that CHICK made about unidentified individuals whom he suggested intended to harm John Doe1 should he fail to do something with one or more of the cell phones that CHICK provided.

<u>*Identification of Third TracFone:*</u>

16.     A second forensic interview of John Doe1 was conducted by an HSI Forensic Interviewer on July 26, 2022. During this interview, John Doe1 disclosed that CHICK had given him three cell phones at different times.  It should be noted that John Doe1 answered most questions during the forensic interview with "I don't know" or "I can't remember," including questions regarding some of the specific conversations outlined above.

17.     Law enforcement believe that the third phone provided to John Doe1 by CHICK is a Tracfone with the telephone number ending -1205 (hereinafter referred to as the "1205 Phone").  Phone records showed that the 1205 Phone was purchased on May 22, 2022, and investigators identified multiple phone calls and text messages exchanged between the 1205 Phone and CHICK's T-Mobile phone ending -1839 from May 24, 2022, through June 9, 2022.

_Maine State Search Warrants:_

18.     On August 2, 2022, a Maine district court issued a search warrant for CHICK's person, his residence, and his vehicle. The warrant specifically authorized seizure of the 1205 Phone, CHICK's cellular phone ending -1839, written communications between CHICK and John Doe1, and telephone records.

19.     On August 3, 2022, in preparation for the search warrant execution, investigators conducted surveillance at CHICK's residence and observed that CHICK's vehicle had not been at the residence during the overnight and early morning hours. Eliot Police Sgt. Ronald Lund contacted CHICK's mother, who shared the residence with CHICK. Using a ruse, Sgt. Lund asked about CHICK's whereabouts. According to his mother, CHICK was in Old Town, Maine with a friend. His mother further reported that Chick had stayed alone with a four-year-old child who is a family friend ("John Doe2"), at the Ramada Inn in Kittery, Maine, for the prior two (2) nights[4]. CHICK's mother reported that CHICK and "John Doe2" had returned to the CHICK residence to use the pool before going to Old Town, Maine. At Sgt. Lund's request, CHICK's mother called CHICK's phone ending -1839, and Sgt. Lund was able to speak with CHICK. CHICK verified that he was at a friend's residence in Old Town, Maine. Sgt. Lund informed

---

[4] Subsequently obtained records from the Ramada Inn in Kittery confirmed that CHICK was a guest from July 31, 2022, through August 2, 2022.

CHICK that he could send Old Town Police Department over to view CHICK's vehicle. CHICK explained that he did not intend to return until later in the week.

20.    Sgt. Lund then contacted the Old Town Police Department and requested their assistance with executing the search warrant of CHICK's person and his vehicle. Investigators from HSI-Bangor assisted the Old Town Police Department with the search of CHICK's person and his vehicle. From CHICK's vehicle, investigators located the following: a TracFone, a digital camera, duct tape, rubber gloves, sweet liquor, candy, children's clothing including underwear, children's toys, and a magnetic GPS vehicle tracker. From CHICK's person, investigators located his cell phone ending -1839. Pursuant to the search warrant issued on August 2, 2022, officers seized only the two cell phones. According to investigators, CHICK provided limited information in a recorded interview.  CHICK and his vehicle were released.

21.    While CHICK's person and vehicle were searched in Old Town, other investigators conducted a search of his residence in Eliot, Maine. From CHICK's bedroom, investigators located the following: one BLU TracFone, an Apple iPhone, assorted phone records, plastic zip-top bag with notes and children's underwear, assorted notes (handwritten and printed from computer(s)), several surveillance cameras including two "pinhole" cameras (with SD cards), tracking devices, two TracFone boxes, two TracFone cards, assorted portable storage media, a 32-GB recording device, a Dell Inspiron laptop, and a Toshiba Satellite laptop.

22.    Investigators located several notes on school bus student permission slips. One note read: "I am going to run out of money. $1,000 per week is what is keeping your family alive and together. And I will run out of money." This aligned with the above-referenced transcription of the May 13th conversation between CHICK and John Doe1.

23.     Investigators located several school writings belonging to John Doe1 and a notebook that appeared to have been used by CHICK and John Doe1 to write notes to each other.

24.     Among the handwritten notes was a letter addressed to John Doe1, which stated:

This whole thing has been very hard for me to talk about. My own family has never heard half of this stuff. But I felt that it was important to tell you. I am only alive today because of you. [John Doe1], you saved my life, and for that I will always be thankful and for that I truly love you.

25.     Investigators located a handwritten note with Spanish phrases that loosely translate to "Can I suck you off this weekend?" and "I want to sleep with you".  Investigators learned that John Doe1 is fluent in Spanish.

26.     Another handwritten note had the following comments/instructions: "Good job, you were great last night. Thank you. You saved yourself. Would have taken you away on Friday." "Wasn't hard to do, right?" "Take off your sleeping shorts and put on your undies that you wore today. No shirt, nothing else. Use the phone, go to the camera." This particular note gave detailed instructions on how to take body selfies from different angles/positions and then offers "extra credit" for making a "video of anything you would consider naughty. Make sure it is a new video." "Take phone, wrap the phone up in the undies. Put them in a zip lock bag, zip it up tight. Put that in another zip lock bag, zip it up tight. Put that in the lunch box, zip it up. Check to make sure the coast is clear, bring lunch box into bathroom. Open window, drop straight down. Then you're done."

27.     Investigators also found computer-generated documents. One read: "YOU HAD TOO MANY CHANCES THIS IS NOT WORKING WE ARE DONE FUCKING ROUND MAKE THIS HAPPEN NOW OR THE KID DISAPPEARS." Another read: "TODAY IS THE DAY YOU HAVE HAD FAR TOO MANY CHANCES. SAY GOODBYE. WE ARE DOING

THIS. DO NOT RUN. DO NOT HIDE. WE KNOW WHERE TO GET YOU. YOU HAD TO HAVE KNOWN THIS DAY WAS COMING. YOU HAVE BEEN FUCKING UP WAY TOO MUCH. YOU HAVE FAILED TO MEET OUR DEMANDS."

28.     Investigators located a series of handwritten notes with instructions on how to keep secrets from parents, teachers, police officers, and to protect one's family from being killed.

29.     Investigators located a note with a reward system and specific requests for "photos/videos, information, and items such as clothing."

30.     Investigators located numerous printed photographs of children at a baseball game that were organized in separate envelopes by individual children.

31.     Investigators located a white envelope with a long, handwritten string of alphanumeric characters as well as a notation referencing "tor".  Based on my training and experience, I believe that this string of alphanumeric characters is likely a web address for a site on the "Tor" network, which is part of the internet known colloquially as the "dark web" or "dark net."  I know based on my training and experience that child exploitation material is widely available on the dark web and that individuals with an interest in child exploitation material often use the dark web to obtain and/or share such material.

32.     Investigators located a handwritten note instructing the reader to "trace or draw an accurate life-sized picture of your penis."  The note further instructed the reader to "complete three drawings, one drawing as if you're looking at it from the side, the second drawing as if you're looking down at it from above, and the third as if you're looking straight ahead at it."  The note concluded "make sure your sister doesn't see it."

33.     Investigators believe that the notes recovered from CHICK's bedroom are

consistent with the threatening and coercive messages CHICK conveyed to John Doe1 in the above-referenced transcriptions. The handwritten and computer-generated documents, as well as the photographs of children and children's underwear, strongly suggests that CHICK has a sexual interest in minors, including John Doe1.

34.     Due to the number of computers, computer media, and other electronic devices located in CHICK's room and evidence that he used cell phones and computer media to communicate with John Doe1, investigators obtained a secondary search warrant to seize computers, computer media, and other electronic devices located in CHICK's bedroom and in his vehicle that were observed by investigators in Old Town. Pursuant to the secondary search warrant authorized on August 3, 2022, investigators seized the computers, computer media, and other electronic devices. I note that the Maine search warrants only authorized the seizure but not the search of the cell phones, computers, computer media, and other electronic devices. To date, none of the electronic devices seized pursuant to the state warrants executed on August 3, 2022, have been forensically examined.

_CHICK'S Statements to Law Enforcement:_

35.     At approximately 8:00 p.m. on August 3, 2022, while investigators were still on scene executing the search warrant, CHICK returned to his residence. Upon CHICK's return, Sgt. Bertogli and HSI Special Agent Michael Perrella encountered him on the front lawn and asked to speak with him. Sgt. Bertogli advised CHICK that he was not under arrest, he was not being detained, he was free to leave whenever he wanted, and he could speak to an attorney if he chose to. CHICK agreed to speak with Sgt. Bertogli and SA Perrella, and their conversation took place outside on the front yard and away from the other investigators who were still

performing the search. The following is a brief synopsis of CHICK's statements to investigators:

    a.   CHICK advised that he had taken two one-minute videos of John Doe2 "peeing" in the bathroom. CHICK claimed he did not watch the videos. He admitted staying with John Doe 2 at the Ramada Inn in Kittery on more than one occasion.

    b.   CHICK said that the "cares a lot" for John Doe 1.

    c.   CHICK admitted that he threatened John Doe1 during conversations on the bus. CHICK further admitted that he put the computer-generated note that read, "YOU HAD TOO MANY CHANCES THIS IS NOT WORKING WE ARE DONE FUCKING ROUND MAKE THIS HAPPEN NOW OR THE KID DISAPPEARS" on his lap and asked John Doe1 to read it.

    d.   CHICK advised that he had some pictures of John Doe1 in public settings, possibly on his phone.

    e.   CHICK admitted that he placed magnetic cellular GPS tracking devices on vehicles belonging to John Doe1's parents. Through the tracking devices, CHICK knew that John Doe1's parents had gone to the Greenland Police station on several occasions. He said the trackers were still on their vehicles and active.[5]

    f.   CHICK advised that he had been to John Doe1's residence approximately 6-10 times during nighttime hours. He denied ever going to the residence to pick up a lunch box containing a cell phone that he had instructed John Doe1 to take pictures of himself with, as described in a handwritten note discussed above.

    g.   CHICK said that he spoke with John Doe1 several times over the cell phones he

---

[5] Investigators subsequently located and removed the tracking devices from the vehicles. The trackers were located on the vehicles where CHICK described having placed them.

provided to the child.

h. When asked about underage images online, CHICK responded, "There shouldn't be a lot, I'm not sure what is on the computer." CHICK further stated that, if there was any child exploitation material, such material would be located on his black Dell laptop computer. CHICK voluntarily provided investigators with the passcode of his Dell laptop computer as "9329" or "3983".

36. When CHICK indicated that he no longer wished to speak with investigators, the interview ended at approximately 10:33 p.m. CHICK was never restricted in his movement or taken into custody. During his discussions with Sgt. Bertogli and SA Perrella, CHICK took breaks to smoke cigarettes and talk to family members.

37. Once the interview concluded, investigators executed the secondary search warrant of CHICK's vehicle and recovered a Coolpix digital camera, a magnetic cellular GPS tracker, Micro SD card, Zetroiny wireless camera, GPS, and Nexar Dashcam w/SD card.

38. Once investigators completed the search of the residence, CHICK and his family returned to their residence.

*John Doe1's Additional Disclosures:*

39. On August 5, 2022, HSI SA Michael Perrella met with John Doe1's father, who advised that John Doe1 had begun to share information with his parents regarding his interactions with CHICK that he had been too fearful to share previously.

40. In summary, the father advised that John Doe1 had talked about an organization that CHICK referred to as "The Team." CHICK told John Doe1 that "The Team" was the organization that was making threats towards John Doe1 and his family. CHICK told John Doe1

that "The Team" had between 800-1800[6] members, and that if John Doe1 did not meet their demands, "The Team" would go to "Plan B," which would result in John Doe1 being kidnapped and tortured. John Doe1 reported that CHICK asked him to make a video and that "The Team" liked clothing and underwear.

      41.     Investigators believe that John Doe1 has not disclosed the nature of all of the demands that were made of him by CHICK.  His father advised that John Doe1 would be willing to participate in a follow-up forensic interview.

      42.     In addition, his father gave permission for SA Perrella to show John Doe1 a note to determine whether he recognized it. SA Perrella met briefly with John Doe1, who reviewed the note that read, "YOU HAD TOO MANY CHANCES THIS IS NOT WORKING WE ARE DONE FUCKING ROUND MAKE THIS HAPPEN NOW OR THE KID DISAPPEARS," and John Doe1 confirmed that CHICK had shown him the note on the bus.

*Characteristics of Sexual Grooming and Child Sexual Exploitation:*

      43.     Based on my training, education, and experience, as well as my discussions with the other experienced investigators involved in this matter, I believe that CHICK engaged in a pattern of sexual grooming with John Doe1. The term "sexual grooming" includes any and all verbal and/or physical acts that constitute the process of cultivating trust with a minor for the purpose of gradually introducing sexual abuse or sexual exploitation. Acts of sexual grooming include but are not limited to: giving the minor gifts, seeking and spending time with the minor alone, asking the minor to keep secrets from parents and other trusted adults, doing favors for the minor, allowing the minor illegal access to adult pleasures such as alcohol, talking with the

---

[6] Investigators initially understood CHICK to have told John Doe1 that "The Team" had between 8-800 members. John Doe1's father later clarified that CHICK told John Doe1 that the number was between 800-1800.

minor about sexual topics, describing sexual conduct using "code" words to the minor, isolating

the minor from others, and deceiving the minor. I use the term "sexual abuse" to include any and

all physical acts of a sexual nature involving a minor, including but not limited to sexual

penetration, oral sex, touching or fondling of a minor's genitals/anus/breasts, or asking a minor

to touch or fondle another's genitals/anus for purposes of sexual gratification.  I use the term

"sexual exploitation" to include the use of the minor to engage in sexually explicit conduct, to

include lascivious exhibition of the pubic area or anus, for the purpose of producing visual

depictions of such conduct.  Based on my training and experience, where the grooming behavior

is directed towards sexual exploitation, the grooming process may begin with requests for

innocent images and/or videos, and then escalate over time to requests for materials that are

increasingly sexual in nature, including images and/or videos that would constitute child

pornography.

44.     Based on my training, education, and experience, as well as my discussions with

the other experienced investigators involved in this matter, I know that individuals involved in

sexual grooming of minors and sexual exploitation of minors often collect and keep mementos

from individual victims.

45.     Furthermore, based upon my knowledge and experience in child sexual

exploitation investigations, and the training and experience of other law enforcement officers

with whom I have had discussions, I know that there are certain characteristics common to

individuals involved in such crimes:

       a.   Those who distribute, transport, receive, or possess child pornography, or who

           attempt to commit these crimes may collect sexually explicit or suggestive

materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals often times use these materials for their own sexual arousal and gratification.

b.  Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often possess and maintain copies of child pornography material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These individuals often retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

c.  Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. They often maintain these collections for several years and keep them close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

d.  Those who distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes also may correspond with and/or meet others to share information and materials; they rarely destroy correspondence from other child pornography distributors/collectors; they conceal such correspondence as

20

they do their sexually explicit material; and they often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

*Computers, Electronic Storage and Forensic Analysis:*

46.     Based on my training, education, and experience, as well as my discussions with the other experienced investigators involved in this matter, I know that the SUBJECT DEVICES have capabilities to serve as storage devices for child sexual exploitation materials and communicating with minor victims and/or others who have an interest in producing or receiving child sexual exploitation materials. In my training and experience, examining the data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the SUBJECT DEVICES.

47.     There is probable cause to believe that things that were once stored on the SUBJECT DEVICES may still be stored in those devices, for at least the following reasons:

    a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  I am also aware, through training and experience, that digital storage devices have become interconnected, making it easy for even casual users of technology to transfer or copy images from one device to another, or to maintain duplicate copies on more than one device or storage medium.   In fact, many devices such as smartphones can be set to automatically back up their contents to alternate storage facilities, such as laptop or desktop computers, another phone, photo-sharing websites, and cloud storage providers.

d.  I am also aware that the contents of smart phones can be synched with or backed up to other digital devices in a variety of ways.  Smartphones can be connected through cables to other devices, such as laptop computers, for data transfer. Smartphones can also connect to other devices and transfer photos or documents wirelessly through technology such as Bluetooth.  Data can also be sent from the phone to an email account via the Internet, and subsequently downloaded from the Internet to a different device (such as a tablet, game system, or computer) for storage. In addition, many smartphones utilize "cloud" storage.  Cellular telephones can be set to automatically back up their contents to user accounts hosted on servers of various cloud storage providers. Users can also opt to perform a back-up manually, on an as-needed basis. I am aware that some

smartphones also back up their contents automatically to devices such as laptop computers.  Additionally, cellular telephones can exchange data between two differing cellular communications devices and other types of electronic and media storage devices via Bluetooth or Wi-Fi, regardless of the type of operating system or platform being utilized to operate each of the electronic devices. In addition, media cards which contain many forms of data can be interchanged between multiple types of electronic devices, including but not limited to, different cellular telephones.

48.    As set forth above, probable cause exists to believe that CHICK violated federal statutes prohibiting the sexual exploitation of a minor and attempted sexual exploitation of a minor), possession of child pornography, coercion and enticement of a minor, and stalking of a minor, and evidence of these federal violations may be located on a variety of electronic devices and storage media owned and/or used by CHICK.

49.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the SUBJECT DEVICES because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage

medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an

accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it and when, it is sometimes necessary to establish that a particular thing is <u>not</u> present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

## CONCLUSION

50.  I respectfully submit that this affidavit establishes probable cause for a search warrant authorizing the examination of the SUBJECT DEVICES described in Attachment A to extract electronically stored information described in Attachment B.

/s/ Ronald Morin
Special Agent Ronald Morin
Department of Homeland Security
Homeland Security Investigations

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. P. 41 and affirmed under oath the contents of this affidavit and application.

Hon. Andrea K. Johnstone
United States Magistrate Judge
Date: August 11, 2022

25

**ATTACHMENT A**

This warrant authorizes the forensic examination of the following SUBJECT

DEVICES for the purpose of identifying electronically stored data more particularly

described in Attachment B:

A. One black Apple iPhone, in a black case, serviced by T-Mobile and assigned

telephone number ending -1839, currently in the lawful possession of HSI at 275

Chestnut Street, Suite 307, Manchester, New Hampshire, that was seized during the

execution of search warrants on August 3, 2022; and

B. The following devices currently in the lawful possession of the Greenland Police

Department, 16 Town Square, Greenland, New Hampshire, that were seized during

the execution of search warrants on August 3, 2022:

1. Sony Digital "Handycam" Video Camera, 422221;
2. Optimus GPS Tracker 3.0 in Magnet Case, black in color;
3. CoolPix W300 Digital Camera, 20076695;
4. Zetroiny Wireless Camera;
5. HP Photosmart Camera M477, CN79CAA0XH;
6. Mini 5918 HD Button DV Camera;
7. Apple iPhone, black in color;
8. Blu Tracfone, black in color;
9. SanDisk BQ2135003663 256 GB;
10. SanDisk BQ2135003663 256 GB;
11. SanDisk 8 GB, BI171026128Z;
12. PNY 16 GB Thumb Drive;
13. 32 GB Recording Device;
14. Micro SD Card - 32 GB WS22;
15. Optimus GPS Tracker 3.0 in Magnet Case;
16. Optimus GPS Tracker 3.0 in Magnet Case;
17. HD Infrared Waterproof Button Camera Blk w/cord;
18. HP CD-R 700MB HD, with the words "CHICK WEED PUSSY" handwritten on disc;
19. 32 GB Hidden Camera X002K4X421;
20. Nexar Dashcam with GPS WC591111490564;
21. Nexar M/V Interior Camera 752830391656;

22. Wireless Mini DVR 2.4G 5V;
23. Dell Inspiron 15 #17543618318 #8250MJ2 #45173/SDPP1/2016 5100;
24. Toshiba Satellite L875D-S723, 66204956R; and
25. SanDisk Imagemate Plus 32 GB MicroSD UHS-I.

## ATTACHMENT B

## ITEMS TO BE EXTRACTED AND SEIZED

1.      All records relating to violations of 2251(a) & (e) (sexual exploitation of a minor and attempted sexual exploitation of a minor), 2252A(5)(B) (possession of child pornography), 2422(b) (coercion and enticement of a minor), and 2261A (interstate stalking of a minor) in any form wherever they may be stored or found on the SUBJECT DEVICES, including:

      a.   Child pornography;

      b.   Child erotica and evidence of access to children;

      c.   Information, correspondence, records, documents or other materials constituting evidence of or pertaining to:

            i.   child pornography, child erotica, or access to children;

            ii.   the production or attempted production, possession, or receipt, of child pornography, child erotica, or visual depictions of minors engaged in sexually explicit conduct;

            iii.   an interest in child pornography or sexual activity with children;

2.      Any electronic data of any type, including but not limited to images, video recordings, audio recordings, documents, electronic mail, instant messages, "chats," voicemail, or other communication contained within the device which:

      a.   Contains any image, description, record, receipt, communication, or other file or documents relating to interstate stalking as defined in Title 18, United States Code, Section 2261A;

      b.   Contains address, telephone number, computer screen name, username, physical description, or other information about any victim or other individual involved in interstate stalking as defined in Title 18, United States Code, Section 2261A;

      c.   Is, or specifically relates to, a communication to or from any minor individual; and/or

        d.   Is, or specifically relates to, a communication to or from any other person regarding the subject of interstate stalking as defined in Title 18, United States Code, Section 2261A.

     3.     For any computer, computer hard drive, or other physical object upon which electronic data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

        a.   Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        b.   Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        c.   Evidence of the lack of such malicious software;

        d.   Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

        e.   Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

        f.   Evidence of the times the COMPUTER was used;

        g.   Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

        h.   Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and/or

        i.   Contextual information necessary to understand the evidence described in this attachment.

     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as hard disks or other media that can

store data); any handmade form (such as writing, drawing, painting); any mechanical form (such

as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides,

negatives, videotapes, motion pictures, or photocopies).

As used above, the term "COMPUTER" includes but is not limited to any and all

computer equipment, including any electronic devices that are capable of collecting, analyzing,

creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic,

optical, or similar computer impulses or data.  These devices include but are not limited to any

data-processing hardware (such as central processing units, memory typewriters, mobile "smart"

telephones, tablets, and self-contained "laptop" or "notebook" computers); internal and

peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and

diskettes, thumb drives, flash drives, Micro SD cards, SD cards, CDs, DVDs, tape drives and

tapes, optical storage devices, zip drives and zip disk media, and other memory storage devices);

peripheral input/output devices (such as keyboards, printers, fax machines, digital cameras,

scanners, plotters, video display monitors, and optical readers); and related communications

devices (such as modems, routers, cables and connections, recording equipment, RAM or ROM

units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or

signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms,

or parts that can be used to restrict access to such hardware (such as physical keys and locks).